_____

No. 95-2257
_____

United States of America,      *
                               *
              Appellee,        *
                               *
     v.                        *
                               *
Douglas Allen Baker,           *
                               *
              Appellant.       *

_____

No. 95-2466                     Appeals from the United States
_____                    District Court for the
                               District of Minnesota

United States of America,      *
                               *
              Appellee,        *
                               *
     v.                        *
                               *
Leroy Charles Wheeler,         *
                               *
              Appellant.       *

_____

          Submitted:  February 14, 1996

             Filed:  September 27, 1996
                 _____

Before McMILLIAN, LAY and HANSEN, Circuit Judges.
                 _____

McMILLIAN, Circuit Judge.

Douglas Allen Baker and Leroy Charles Wheeler appeal from final judgments entered in the District Court[1] for the District of Minnesota, upon a jury verdict, finding each guilty of aiding and

_____

[1]The Honorable Robert G. Renner, Senior United States District Judge for the District of Minnesota.

abetting the other in knowingly possessing a toxin for use as a weapon in violation of 18 U.S.C. §§ 175, 2. The district court sentenced Baker and Wheeler each to 33 months imprisonment, 3 years supervised release and a special assessment of $50. For reversal, Baker argues the district court erred in denying his motion to sever and in admitting into evidence certain hearsay statements. For reversal, Wheeler argues the district court erred in admitting into evidence co-conspirator's statements. Both defendants also argue 18 U.S.C. § 175 is unconstitutional, the district court erred in admitting into evidence certain documents, the evidence was insufficient to support the jury verdict, and the district court erred in denying their motion for jury selection from a particular division. For the reasons discussed below, we affirm Wheeler's conviction and sentence, but we reverse Baker's conviction and remand his case to the district court for further proceedings.

BACKGROUND FACTS

On May 21, 1992, Colette Baker, the wife of defendant Baker, went to the Pope County, Minnesota, sheriff's office. She appeared to be very nervous. She talked to the receptionist, Joan Holtberg. Colette Baker was carrying a small red coffee can. Inside the coffee can were a baby food jar containing a white powder, a fingernail polish bottle containing a greenish gel, a pair of rubber gloves, and a handwritten note.[2] Colette Baker took each of

---

[2]The text of the note was as follows (minor misspelling corrected):

> DOUG, Be extremely careful! After you mix the powder with the gel, the slightest contact will kill you! If you breathe the powder or get it in your eyes, you're a dead man. Dispose all instruments used. Always wear rubber gloves and then destroy them also.
>     Good hunting!!
> P.S. Destroy this note!!

the items out of the coffee can and showed them to Holtberg. Colette Baker referred to the contents of the coffee can as

"Maynard" and told Holtberg that she believed that the powder and gel were only dangerous if they were mixed together.

The sheriff's office turned over the coffee can and its contents to the FBI for analysis. The FBI found two of Wheeler's fingerprints inside one of the rubber gloves and one of his fingerprints on the bottom of the coffee can. The United States Army Medical Research Institute of Infectious Diseases identified the white powder as ricin. Ricin is a toxin derived from the castor bean plant and is extremely deadly. There is no known antidote for ricin poisoning. FBI special agent Thomas Lynch testified that the process for producing ricin from castor beans is relatively simple and is described in various publications which are commercially available. The baby food jar contained about .7 gram of 5% pure ricin, which, according to a government witness, was enough to kill 126 people. The greenish gel was a mixture of dimethyl sulfoxide (DMSO), a solvent which can penetrate the skin, and aloe vera gel, which is used in cosmetics and hair care products. According to Lynch, DMSO could be combined with ricin to carry the ricin through the skin; however, Lynch did not believe that DMSO would be an effective carrier unless the skin was broken and the ricin could enter the body through cuts or scratches.

Scott Loverink testified that he had known Wheeler since the late 1970s but had never met Baker. Loverink testified about conversations he had had with Richard Oelrich and Dennis Bret Henderson in the early 1990s about ordering castor beans through the mail, processing the castor beans into ricin, and using the ricin to kill people. According to Loverink, in the summer of 1991, Henderson told him that he (Henderson) had ordered some castor beans and had planted them in Wheeler's yard. Henderson also introduced Loverink to Oelrich. According to Loverink, Oelrich referred to "bureaucratic flu," identified various

government employees as potential targets, and described the advantages of ricin over other poisons and how ricin could be used

with DMSO to carry the ricin through the skin. Henderson also discussed how ricin could be used with DMSO and left in places where people would touch it.

According to Loverink, Oelrich and Henderson referred to ricin as "Maynard." Loverink did not initially know why they did so. However, Loverink later received copies of a newsletter called the CBA Bulletin and noticed that the newsletter contained advertisements for castor beans and instructions for making ricin which could be purchased from Maynard Campbell in Ashland, Oregon. Henderson told Loverink that was why they called ricin "Maynard."

Loverink testified that sometime during the summer of 1991, possibly in August, Henderson left a baby food jar containing ricin in his (Loverink's) workshop for about two weeks. Henderson explained to Loverink that he did not want to store it because there were small children around his house.

In July 1994 a federal grand jury charged Baker and Wheeler with one count of aiding and abetting one another in knowingly possessing a toxin, ricin, for use as a weapon, in violation of 18 U.S.C. §§ 175, 2. Following their arrests, FBI special agent Daniel Lund interviewed them. According to Lund, Baker admitted possessing a powder he called "Maynard" two to three years before, but explained that he intended to use it as an insecticide by sprinkling it on cabbage plants in his garden (he did not do so). Baker denied receiving the powder from Henderson. Baker said that the powder was in a coffee can and that there were rubber gloves in the coffee can; he could not remember any specific instructions for its use except not to touch or inhale it or who had referred to the powder as "Maynard."

Lund also interviewed Wheeler. The interview was reduced to writing and Wheeler signed the written statement. The written statement was introduced into evidence at the trial (as Government

Exhibit 12). Wheeler said that he was aware of a toxin called "Maynard" made from castor beans and that he had heard Oelrich, Henderson and Duane Baker, defendant Baker's father, discuss it. Wheeler had heard Oelrich and Henderson discuss mixing "Maynard" with DMSO and aloe vera and he also knew that DMSO is quickly absorbed into the skin. Wheeler knew about the advertisements for castor beans in the CBA Bulletin and that Oelrich had received the CBA Bulletin. Wheeler also knew that in April 1991 Oelrich had ordered castor beans from Maynard Campbell and that the castor beans had been sent to his (Wheeler's) house. Wheeler gave the castor beans to Henderson. According to Wheeler, Henderson processed the castor beans into ricin in his (Wheeler's) shed. Henderson wore rubber gloves and a face mask during the process. Wheeler described the ricin as a white powdery substance. Wheeler knew that it was a deadly poison and he had heard Oelrich and Henderson discuss using "Maynard" to kill people. Wheeler said that Henderson put the powder in a baby food jar, which he (Henderson) then put inside a coffee can and stored in Wheeler's shed for several months.

Pre-trial motions, including motions to sever, to dismiss the indictment and for trial in, or for a jury drawn from, the division where the offense charged occurred, were denied. The offense charged occurred in Pope County, Minnesota, which is in Division 6 of the District of Minnesota. Then-Chief Judge Diana E. Murphy, in Division 4, had originally been assigned to preside over the trial. However, upon Judge Murphy's appointment to this court, the case was reassigned to Judge Renner, in Division 3. Jurors for trials in Division 3 are also drawn from Division 1. The jury found defendants guilty. The district court sentenced each defendant to

33 months imprisonment, 3 years supervised release and a special assessment of $50.  These appeals followed.[3]

BAKER-- SEVERANCE

Baker argues that his case should not have been joined with Wheeler's and that the district court abused its discretion in denying his motion for severance.  He argues that he was prejudiced by the joinder because the jury heard evidence that was admissible only against Wheeler, including co-conspirator's statements and Wheeler's inculpatory statement to the FBI.

Assuming for purposes of analysis that defendants were properly joined, Fed. R. Crim. P. 8(b) (defendants may be charged in the same indictment if they are alleged to have participated in the same act constituting an offense), we think this is the rare case in which severance should have been granted pursuant to Fed. R. Crim. P. 14 because there is a serious risk that the joint trial prevented the jury from making a reliable judgment about guilt or innocence.  Zafiro v. United States, 506 U.S. 534, 539 (1993).  This is because evidence that the jury should not have considered against Baker and that would not have been admissible if Baker had been tried alone was admitted against Wheeler, Baker's co-defendant.  Most of the evidence was properly admissible only

---

[3]There was some uncertainty about whether Baker intended to dismiss his appointed counsel and his appeal because, after the briefs had been filed, Baker submitted several pro se motions, including what was in effect a motion to voluntarily dismiss his appeal.  We remanded the case to the district court for the limited purpose of holding an evidentiary hearing on this question.  After conducting a telephone status conference with counsel and reviewing affidavits from Baker, the district court concluded that Baker did not want to dismiss his appointed counsel or his appeal and that therefore no evidentiary hearing was necessary.  We appreciate the district court's prompt attention to this matter.

against Wheeler. Baker and Wheeler were not charged with conspiracy. As discussed below, the conspiracy alleged involved

Wheeler, Henderson and Oelrich, but not Baker. Co-conspirator's statements that the jury should not have considered against Baker and that would not have been admissible against Baker if Baker had been tried alone were admitted against Wheeler. Id. As discussed below, the advertisements and the book cover, which were very prejudicial and highly inflammatory, were admissible against Wheeler only. In addition, Wheeler's inculpatory statement to the FBI was evidence that was probative of Baker's guilt (Wheeler's statement does not incriminate Baker on its face but arguably does so only when linked to other evidence) but was technically admissible only against Wheeler. Id. Even though the issues and the evidence were relatively straight-forward, the risk of substantial prejudice from the spillover effect of the conspiracy evidence and the documents was too high to be cured by less drastic measures, such as the limiting instructions given by the district court. This is especially true in light of the extremely serious and admittedly sensational nature of the offense charged. Moreover, this is not the kind of case in which we can say, in light of the jury's verdict, that the jury was able to compart- mentalize the evidence as it related to each defendant. See, e.g., United States v. Flaherty, 76 F.3d 967, 972 (8th Cir. 1996) (fact that jury did not convict both defendants of both counts is evidence of its ability to analyze and distinguish evidence as to each); United States v. Davidson, 936 F.2d 856, 861 (6th Cir. 1991). Baker and Wheeler were charged together, in one count, with aiding and abetting the other in knowingly possessing ricin for use as a weapon.

For this reason, we reverse Baker's conviction and remand his case to the district court for further proceedings. We discuss the other issues raised by Baker and the issues raised by both defendants because they could become issues if Baker is retried.

BAKER-- COLETTE BAKER'S STATEMENTS

Baker also argues the district court abused its discretion in admitting into evidence Colette Baker's statements to the sheriff's receptionist that the coffee can contained "Maynard" and that the contents were only dangerous if mixed together.  Baker argues that these statements were inadmissible hearsay.  Fed. R. Evid. 801(c).  We agree.  These statements were made by the declarant (Colette Baker) out of court and were offered, through the testimony of the sheriff's receptionist, to prove the truth of the matters asserted therein, that is, that the coffee can contained "Maynard," the contents were only dangerous if mixed together, and, by reasonable inference, Baker's knowledge about the coffee can, its contents and its dangerousness.  These statements do not fall within any of the hearsay exceptions and therefore were not admissible.

WHEELER-- CO-CONSPIRATOR'S STATEMENTS

Wheeler argues the district court abused its discretion in admitting into evidence co-conspirator's statements made by Henderson and Oelrich.  The co-conspirator's statements were admitted against Wheeler only.  Wheeler argues there was no evidence that he was involved in a conspiracy with Oelrich and Henderson and that, even if there was evidence of a conspiracy, the statements were not made in furtherance of the conspiracy.  He argues the evidence showed only that he associated with Oelrich and Henderson, knew about their activities and had listened to their conversations.  We disagree.

> [Fed. R. Evid.] 801(d)(2)(E) is the coconspirator exception to the hearsay rule.  "As a general rule, statements made by a coconspirator in furtherance of the unlawful association . . . are properly admissible against all conspirators, whether or not a conspiracy is

-13-

actually charged."  Before admitting the disputed statements, the District Court must find by a preponderance of the evidence [and can consider the very

> hearsay statements sought to be admitted] that a conspiracy existed to which the declarant and the defendant were parties and that the statements were made in furtherance of the conspiracy.
>
> . . . .
>
> A statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy; instead, the statement must "somehow advance the objectives of the conspiracy."

United States v. Mitchell, 31 F.3d 628, 631-32 (8th Cir. 1994) (citations omitted).

The co-conspirator's statements and other evidence, including Wheeler's inculpatory statement to the FBI, established by a preponderance of the evidence that Wheeler, Henderson and Oelrich were involved in a conspiracy to manufacture and knowingly possess ricin for use as a weapon. The evidence showed that Wheeler had heard Henderson and Oelrich and others discuss mixing ricin with DMSO and aloe vera gel and using it to kill people, including unspecified government officials; Wheeler knew that ricin was poisonous and dangerous to handle; castor beans ordered by Oelrich from Maynard Campbell were delivered to Wheeler's house; Wheeler gave the castor beans to Henderson; Henderson "processed" the castor beans in Wheeler's shed; and Henderson stored the ricin in Wheeler's shed for several months. Henderson's and Oelrich's statements were not merely informative; they attempted to involve Loverink in their criminal activities and succeeded in persuading Loverink to store the ricin in his workshop for two weeks. The district court did not abuse its discretion in admitting into evidence against Wheeler the co-conspirator's statements made by Henderson and Oelrich.

-15-

DOCUMENTS

Both defendants argue the district court erred in admitting into evidence certain documents, specifically, advertisements for castor beans from the CBA Bulletin (Gov't Exs. 6 (Mar. 1991), 7 (Apr. 1991)) and the cover of a book titled Silent Death (Gov't Ex. 13). Defendants argue that there was no evidence that they had in fact ever seen the advertisements or the book cover and that the documents were inflammatory and highly prejudicial. The advertisements and the book cover include the words "silent death" in a distinctive typeface and a skull-and-crossbones illustration. FBI special agent Lynch testified that the text of the advertisements incorporate references to the title of the book. The book itself was not admitted into evidence, and defense objections to questions about its contents were sustained.

The district court did not abuse its discretion in admitting these documents into evidence against Wheeler. The advertisements and the book cover were relevant and probative evidence of Wheeler's knowledge that ricin could be used as a weapon (or at least was advertised as such). The advertisements explained why Wheeler (and others) called the ricin "Maynard," showed how castor beans could be purchased by mail order from Maynard Campbell's Avenging Angel Supply, and described ricin (rather sensationally) as a "tool of justice" and as a "Silent Death for those who hate God, Freedom and this Republic!"

However, we do not think the documents should have been admitted against Baker. Unlike Wheeler, who had admitted knowing about the advertisements in the CBA Bulletin and about processing castor beans into ricin, there was no evidence that Baker had ever seen or knew about the advertisements, the CBA Bulletin, or the

-16-

book, or that he was part of the conspiracy.  The advertisements and the book cover, which provided a graphic nexus between castor

beans, Maynard Campbell and the use of ricin as a weapon, can only have had an extremely prejudicial impact on the jury.

JURY SELECTION

Both defendants argue the district court erred in denying their motion for trial in, or for a jury drawn from, the division where the offense occurred. Defendants argue that their statutory and sixth amendment rights to a jury drawn from the community where the offense occurred were violated because the jury was not drawn from Division 6, where the offense occurred, but instead from Division 3, where the trial was held. (Jurors were also drawn from Division 1.) We disagree. There is no statutory or constitutional right to a jury drawn either from the entire judicial district or from the division in which the offense occurred. E.g., United States v. Balistrieri, 778 F.2d 1226, 1229 (7th Cir. 1985) (jury need not be selected from division in which crime committed), cert. denied, 477 U.S. 908 (1986); Zicarelli v. Dietz, 633 F.2d 312, 317-18 (3d Cir. 1980) (no constitutional right to jury chosen from division where offense was committed or from entire district which includes that division), cert. denied, 449 U.S. 1083 (1981).

INTERSTATE OR FOREIGN COMMERCE NEXUS-- LOPEZ DEFENSE

Next, both defendants argue 18 U.S.C. § 175 is not a valid exercise of congressional power under the commerce clause in light of United States v. Lopez, 115 S. Ct. 1624 (1995), because there is no substantial nexus between interstate or foreign commerce and the offense of possession of ricin for use as a weapon. In United States v. Lopez the Supreme Court held that Congress exceeded its authority under the commerce clause when it enacted the Gun-Free School Zones Act, which made it a federal offense knowingly to possess a firearm within 1000' of a school, because that activity

-18-

had no substantial relation to interstate commerce. <u>Id.</u> at 1629-30. The statute, by its terms, had "nothing to do with

commerce or any sort of economic enterprise," contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce, and there were no congressional findings that would have enabled the Court "to evaluate the legislative judgment that the activity in question substantially affected interstate commerce." Id. at 1630.

Defendants did not raise this issue in the district court and raise this issue for the first time on appeal. (Wheeler amended his brief on appeal to join Baker in raising this issue.) In pre-trial motions defendants argued the statute was unconstitutional because it was vague and overbroad. At sentencing Baker argued the statute was unconstitutional on several grounds but did not raise the commerce clause issue. The failure to raise the issue in the district court constitutes a waiver of the issue. E.g., United States v. Flaherty, 76 F.3d at 973 (failure to raise Lopez issue in district court resulted in waiver); see also United States v. Baucum, 317 U.S. App. D.C. 63, 80 F.3d 539 (1996) (per curiam) (opinion denying petition for rehearing) (Lopez challenge held nonjurisdictional and thus waived by failure to raise it in trial court), petition for cert. filed, No. 96-1501 (U.S. July 8, 1996). Although the Supreme Court decided Lopez on April 26, 1995, several months after defendants' trial in February 1995, this is not a case in which the law changed so dramatically and unexpectedly so as to excuse the failure to raise the issue in the district court. Lopez was argued to the Supreme Court on November 8, 1994, and the commerce clause arguments were widely known. Defendants were indicted in July 1994, the trial was held in February 1995, and Baker was sentenced on May 18, 1995, and Wheeler on June 1, 1995. Defendants could have raised the commerce clause arguments either at trial or at sentencing.

SUFFICIENCY OF THE EVIDENCE

Both defendants argue the evidence was insufficient to support the jury verdict. Baker does not dispute that he possessed the ricin; he argues there was insufficient evidence that he possessed the ricin for use as a weapon or aided and abetted another in possessing the ricin for use as a weapon. Wheeler does dispute the sufficiency of the evidence of possession. Wheeler argues there was insufficient evidence that he exercised any dominion or control over the ricin, possessed it for use as a weapon or aided and abetted another in possessing the ricin for use as a weapon and that he was merely an innocent bystander. We disagree.

"The standard of review of an appeal concerning the sufficiency of the evidence is very strict, and the verdict of the jury should not be overturned lightly." United States v. Burks, 934 F.2d 148, 151 (8th Cir. 1991). "The jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt." United States v. Erdman, 953 F.2d 387, 389 (8th Cir.), cert. denied, 505 U.S. 1211 (1992). "In reviewing the sufficiency of the evidence on appeal, the court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." Id. "A conviction may be based on circumstantial as well as direct evidence. The evidence need not exclude every reasonable hypothesis except guilt." Id. "If the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction." United States v. Burks, 934 F.2d at 151.

> [W]e must determine whether the facts so viewed
> sufficiently proved the elements of aiding and abetting,
> which are: (1) that the defendant associated with the
> illegal activity; (2) that the defendant participated in

it as something he or she wished to bring about; and (3) that the defendant sought by his or her actions to make the activity succeed.

United States v. Robinson, 782 F.2d 128, 130 (8th Cir. 1986).

On the one hand, "[m]ere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt; nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting." On the other hand, "there are circumstances where presence itself implies participation-- as where a 250-pound bruiser stands silently by during an extortion attempt, or a companion stands by during a robbery, ready to sound a warning or give other aid if required." In sum, the line that separates mere presence from culpable presence is a thin one, often difficult to plot.

United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) (citations omitted), cert. denied, 506 U.S. 1063 (1993).

We have reviewed the evidence and hold there was sufficient evidence to support the jury verdict that Baker knowingly possessed ricin for use as a weapon. The government showed that ricin is extremely toxic, deadly in extremely small quantities, and very difficult to detect, there is no known antidote, and has been popularized in various publications as a method to kill people. The handwritten note, which was addressed to "Doug" and found inside the coffee can, contained information about the dangerous-ness of the contents and the precautions to be used in handling it. Although there was no direct evidence that Baker had in fact read the note, the jury could have reasonably inferred that he had done so. The jury could have also inferred that the note was from Wheeler; Wheeler's fingerprints were found on rubber gloves inside the coffee can and on the coffee can itself. Baker admitted in his

-23-

statement to the FBI that he knew that ricin was dangerous and had to be handled with extreme care.  The jury could have found that

Baker's statements that he intended to use ricin to kill garden pests and that he did not know who had given it to him were false.

We also hold the evidence was sufficient to support the jury verdict that Wheeler possessed ricin for use as a weapon or that he aided and abetted another in possessing ricin for use as a weapon. The evidence showed that Wheeler's fingerprints were found on the outside of the coffee can and in one of the rubber gloves found inside the coffee can. As noted above, the ricin, the handwritten note and the rubber gloves were found inside the coffee can. Wheeler admitted in his statement to the FBI that he knew that ricin was a deadly poison and had to be handled extremely carefully, that Oelrich had ordered the castor beans from Maynard Campbell, and that Henderson had processed the castor beans and stored them in his (Wheeler's) shed. In addition to the government's evidence about ricin's toxicity, there was also evidence that Wheeler had heard Henderson and Oelrich discuss using ricin to kill people. The jury could have reasonably inferred from the evidence that, had Wheeler been merely an innocent bystander, he would not have assisted Oelrich and Henderson or listened to their discussions about using ricin to kill people. "Jurors can be assumed to know that criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences." Id. (discussing mere presence/ innocent bystander defense).

Accordingly, we affirm Wheeler's conviction and sentence, but we reverse Baker's conviction and remand his case to the district court for further proceedings. Wheeler's motion to amend his brief on appeal is granted.

-25-

HANSEN, Circuit Judge, dissenting in part.

I respectfully dissent from that part of the court's opinion which reverses Douglas Allen Baker's conviction for the singular reason that the district court did not sever his trial from that of his co-defendant, Leroy Charles Wheeler.[4] I concur in that part of the opinion which affirms Wheeler's conviction and sentence.

In my view, there is little reason to find this to be the rare case in which severance should have been granted. This was a single count indictment naming Wheeler and Baker as the only defendants; each was charged with aiding and abetting the other in knowingly possessing ricin for use as a weapon. The trial court went to some length to instruct the jury with respect to what evidence was admissible against which defendant, and to inform the jury that each defendant was to be judged only on that evidence which was admitted against that defendant.

I start with a proposition not mentioned in our court's opinion -- that severance is a matter committed to the sound discretion of the district court, and it is only when the district court abuses that discretion and a defendant can clearly demonstrate "severe or compelling prejudice" resulting therefrom that the nonsevered defendant is entitled to a new trial. United States v. Fregoso, 60 F.3d 1314, 1328 (8th Cir. 1995) (internal quotations omitted).

"There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States,

---

[4]As I read the court's opinion, it does not reverse Baker's conviction for evidentiary error but instead finds the evidence against Baker sufficient to support the jury's guilty verdict. Ante at 14.

506 U.S. 534, 537 (1993). Joint trials promote efficiency and serve the interests of justice. Id. Richardson v. Marsh, 481 U.S.

200, 209-10 (1987). A defendant seeking severance has the heavy burden of demonstrating that the joint trial will impermissibly infringe on his right to a fair trial. United States v. Darden, 70 F.3d 1507, 1527 (8th Cir. 1995), cert. denied, 116 S. Ct. 1449 (1996); United States v. Adkins, 842 F.2d 210, 212 (8th Cir. 1988). The appellant must demonstrate that the jury was unable to compartmentalize the evidence as it relates to the two defendants. Adkins, 842 F.2d at 212.

The court finds prejudice because evidence was presented to the jury against Wheeler which would not have been admissible if Baker were tried separately. But that happens in most every trial where there is more than one defendant, and limiting instructions are usually deemed sufficient to cure any risk of prejudice. See Richardson, 481 U.S. at 206-208. When Loverink testified for the government about the conspiracy, the court was very careful to tell the jury not once, but twice, that it could not use Loverink's testimony against Baker. (Tr. at 246-47 (before Loverink's testimony); Tr. at 313-14 (after Loverink had testified).) The court relies on Zafiro, but Zafiro only says that a risk of prejudice "might" occur when such evidence is admitted. Our court's opinion grants relief without showing how the facts of this case turn "might occur" into "did occur." The court also finds prejudice because Wheeler's inculpatory statement (which the court agrees did not implicate Baker on its face but arguably does so when linked to other evidence) was admitted against Wheeler at the joint trial. The district court gave the jury the following instruction at the time the evidence about Wheeler's statement was offered:

    THE COURT: Now, members of the Jury, I'm
    going to give you another instruction at this
    time concerning this witness' testimony relating

-28-

to the certain statements alleged to have been made by the Defendants.

You're about to hear testimony concerning statements made by the Defendants, as I said. You may consider the

statement of defendant Wheeler only in the case against him and not in the case against defendant Baker.  What that means is that you may consider defendant Wheeler's statement in the case against him, and for that purpose rely on it as much or as little as you think proper.  But you may not consider or discuss that statement in any way when you are deciding if the Government has proved beyond a reasonable doubt its case against defendant Baker.

(Tr. at 372-73.)

Such a procedure was expressly approved by the Supreme Court in Richardson v. Marsh, 481 U.S. at 211 (no Confrontation Claim violation when nontestifying codefendant's statement which has been redacted to eliminate the codefendant's name and any reference to the codefendant's existence is admitted at joint trial).  In its final instructions the jury was told that it must give separate consideration to the evidence about each individual defendant and that each defendant was entitled to be treated separately.  (Tr. at 558.)  There is nothing in this record to indicate the jury failed to follow its instructions.

This was a simple, straightforward trial raising basic, noncomplex issues of possession and intent.  The jury was only dealing with one count and two defendants.  Only five witnesses were called by the government.  The court's limiting instructions were clear, correct, and appropriately given.  Our court reasons that relief should be granted in part because "this is not the kind of case in which we can say, in light of the jury's verdict that the jury was able to compartmentalize the evidence as it related to each defendant."  The court's statement is true, but it is true in every case where there is but a single count and two defendants. Absent a finding of not guilty as to one of the two defendants, there is no way the jury's verdict proves or disproves its ability

-30-

to compartmentalize the evidence.  Because that is so, no inference either way can be drawn from this jury's verdict.  The burden

remains on the defendant to show "real prejudice."  Adkins, 842
F.2d at 212.

Clearly, more evidence was presented against the defendant
Wheeler than against the defendant Baker.  But that in itself is no
basis for finding that the trials should have been severed.  United
States v. Davis, 882 F.2d 1334, 1340 (8th Cir. 1989) ("'Severance
is not required merely because the evidence against one defendant
is more damaging than the evidence against another.  Severance
becomes necessary where the proof is such that a jury could not be
expected to compartmentalize the evidence as it relates to separate
defendants.'") (quoting United States v. Faul, 748 F.2d 1204, 1217
(8th Cir. 1984), cert. denied, 472 U.S. 1027 (1985)) (other
internal quotations omitted), cert. denied, 494 U.S. 1029 (1990).

In Davis, we held that a case involving two defendants, no
complex issues, three days of trial, and eight counts was "a case
[where] a jury undoubtedly is capable of properly compartmen-
talizing the evidence."  882 F.2d at 1340 (citations omitted)
(emphasis added).  The case at bar is also one where the jury
undoubtedly was capable of compartmentalizing the evidence pursuant
to the experienced district court's clear instructions.  There is
nothing in this record to indicate to the contrary.

To the extent that our court relies on the district court's
evidentiary error in admitting against Baker the advertisement for
the castor beans from the CBA Bulletin and the book cover from
Silent Death as proof that Baker suffered severe prejudice from the
district court's denial of his severance motion, ante at 7, 11, I
believe the court's reliance to be misplaced.  Granting Baker a
separate trial would not have prevented the same error from
occurring because there is no reason to believe that at a separate
trial for Baker, the government would not have offered the

-32-

documents against him or that the district court would not have let them in.   The two issues of evidentiary error by the district

court and a jury's ability or inability to compartmentalize the admitted evidence appear to me to be separate and independent, with neither impacting the other.

Because the defendant Baker has failed to carry his burden of demonstrating "real prejudice" caused by the joint trial (as opposed to evidentiary error), he has also failed to show that the district court abused its broad discretion in denying his Rule 14 severance motion. Consequently, I would affirm Baker's conviction and sentence.

Accordingly, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-34-