# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1741
_____

United States of America

*Plaintiff - Appellee*

v.

Kim Phuong Taylor, also known as Kimberly Taylor

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Northern District of Iowa - Western
_____

Submitted: January 17, 2025
Filed: November 17, 2025
_____

Before GRASZ, STRAS, and KOBES, Circuit Judges.
_____

STRAS, Circuit Judge.

Voter fraud is no myth. Kim Phuong Taylor does not think what she did counts, but the jury instructions were accurate and the evidence was sufficient, so we affirm.

# I.

Taylor, who was born in Vietnam, moved to the United States over 20 years ago. Along with her husband, she settled in Sioux City, Iowa, where she was active in the local Vietnamese community.

In 2020, Taylor decided to run her own version of a get-out-the-vote campaign. The idea was to help Vietnamese Americans, some of whom struggled with English and were unfamiliar with our election system, register and vote. Her motives were not purely altruistic: she hoped they would vote for her husband, who was a candidate in the election.

Absentee voting was common during the pandemic. Taylor made it easy by bringing the necessary forms, translating them, having voters complete them, and returning them to the county auditor's office. Once the ballots arrived in the mail, Taylor would come back and help fill them out.

Sometimes, however, Taylor did more than just help. If she learned that a voting-age child was away from home, perhaps at college, she would instruct someone else in the family to complete the necessary forms and then vote on their behalf. For others, she just completed those steps herself. She turned in a total of 26 doctored documents, all with handwriting or signatures that were not the children's own.

The county auditor, who grew suspicious of Taylor's activities, contacted the FBI. After investigating, agents arrested her at her home. An indictment relied on two federal statutes to charge her with 52 counts of voter fraud, both as a principal and as an accomplice. *See* 52 U.S.C. §§ 10307, 20511.

Taylor's defense was that she did not know she was breaking the law. She requested an instruction along those lines that would have required the jury to find that she did or that she at least knew the children did not consent to her vote-by-proxy

scheme. The district court[1] relied on the model jury instructions instead, which did not mention either possibility. Based on those instructions and the evidence presented at trial, the jury found Taylor guilty of all 52 counts. Her motion for a judgment of acquittal fared just as poorly.

## II.

Jury instructions are an important part of any criminal trial. They must, among other things, "adequately advise the jury of the essential elements of the offenses charged and the burden of proof required of the government." *United States v. Rice*, 449 F.3d 887, 895 (8th Cir. 2006) (citation omitted). A district court has discretion in crafting the language, but it must "adequately set[] forth the law." *United States v. Gilmore*, 968 F.3d 883, 886 (8th Cir. 2020) (citation omitted). Taylor argues it did not happen here because the instructions lowered the mental state needed for a conviction. *See United States v. Bailey*, 571 F.3d 791, 804 (8th Cir. 2009) (citation omitted) (stating that an abuse occurs when the instructions reflect a "legal error").

## A.

One group of counts charged Taylor with 26 violations of 52 U.S.C. § 20511(2). The crime involves "knowingly and willfully depriv[ing] . . . the residents of a State of a fair and impartially conducted [federal] election process[] by . . . procur[ing] . . . voter registration applications [or ballots] that are known by the person to be materially false, fictitious, or fraudulent under the laws of the State." 52 U.S.C. § 20511(2)(A)–(B) (listing other prohibited acts, like "submi[tting] . . . voter registration applications" and "casting[] or tabulati[ng] . . . ballots").

---

[1]The Honorable Leonard T. Strand, then Chief Judge, now United States District Judge for the Northern District of Iowa.

The elements that matter here set the mental state for the crime. One resembles traditional fraud by requiring "know[ledge]" that a voter-registration application or ballot is "materially false, fictitious, or fraudulent under [state] law[]"—the statutory equivalent of a knowing-misrepresentation requirement. *Id.*; *see Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 188 (2022) (discussing the knowing-misrepresentation element of fraud). The other is a heightened mental state that requires any violator to have "knowingly *and* willfully deprive[d], defraud[ed], or attempt[ed] to deprive or defraud . . . by . . . procur[ing]" the false document. *Id.* § 20511(2)(A)–(B) (emphasis added). To "adequately set[] forth the law," the instructions needed to capture both elements. *Gilmore*, 968 F.3d at 886 (citation omitted).

Mirroring the statute, the instructions laid out the mental-state requirements for the jury. The first stated that Taylor had to "kn[o]w that the [documents] were materially false, fictitious or fraudulent." The other required it to find that she "knowingly and willfully deprived, defrauded[,] or attempted to deprive or defraud the residents of Iowa of a fair and impartially conducted election process." To avoid any confusion, the instructions also explained that "[t]he phrase 'deprive or defraud the residents of Iowa of a fair and impartially conducted election process' means that the defendant acted in a manner *intended to deceive or mislead* election officials into accepting a [document] that the defendant *knew to be defective under Iowa law*." (Emphases added). Just like the statute they were describing, the instructions layered one mental state on the other. *See* 52 U.S.C. § 20511(2)(A)–(B).

Considered as a whole, these instructions accurately conveyed the law. First, they placed the burden on the government to prove beyond a reasonable doubt that Taylor knowingly committed fraud through the procurement or submission of false, fictitious, or fraudulent documents aimed to deceive or mislead Iowa election officials. Second, the instructions used formulations of "willfully" and "knowingly" that we have approved in the past. To have knowledge, Taylor could not have acted through "ignorance, mistake, or accident." *See United States v. Holy Bull*, 613 F.3d 871, 874 (8th Cir. 2010). And to act willfully, she needed "the intent to do something

-4-

the law forbids." *United States v. Benton*, 890 F.3d 697, 715 (8th Cir. 2018). These are among the highest mental states available in criminal law. *See Borden v. United States*, 593 U.S. 420, 426 (2021); *Bryan v. United States*, 524 U.S. 184, 191–92 (1998).

Taylor thinks the instructions should have required even more. Given how "technical" voting requirements can be, she seemingly wants us to borrow the definition of "willful" from tax law. A "willful violation" in those cases requires the jury to "find that the defendant was aware of the specific provision of the tax code that he was charged with violating." *Bryan*, 524 U.S. at 194 (discussing *Cheek v. United States*, 498 U.S. 192, 201 (1991)). To avoid the "danger of convicting" someone for "engag[ing] in apparently innocent activity," she argues that the same supercharged mental state ought to apply to voter fraud. *Id.* at 195.

Although Taylor did not get the exact language she wanted, the instructions ruled out a guilty verdict based on anything less than knowledge that she was breaking the law. As relevant here, they required the jury to find that (1) she "intended to deceive or mislead election officials into accepting a [document] that [she] *knew* to be defective *under Iowa law*" and (2) she acted "with the *intent* to do something *the law forbids*."[2] (Emphases added). *See Robertson*, 709 F.3d at 745 (noting that similar language ensured that "the jury necessarily found [(1)] that [the defendant] acted with a culpable state of mind" and (2) that "she knew her conduct was wrongful"). Neither left any ambiguity.

---

[2]For the same reason, the jury did not need a specific good-faith instruction. *See United States v. Robertson*, 709 F.3d 741, 747 (8th Cir. 2013) ("[W]e have repeatedly held that a district court does not abuse its discretion in declining to give a requested good[-]faith instruction, so long as the instructions given adequately described the mens rea element of the offense."). Here, it would have been redundant given that the government already had to prove that Taylor acted "willfully" and knew the documents were "defective under Iowa law." Once the jury made those findings, "by definition there [could be] no good faith." *Id.* at 746.

More broadly, culpability comes in many forms. *See United States v. Bailey*, 444 U.S. 394, 403–04 (1980) (discussing various mental states). For this statute, it requires knowledge that the conduct itself is illegal, not what provision of the state criminal code makes it unlawful. Especially when the knowingly-and-willfully requirement appears in connection with a non-technical prohibition on depriving, defrauding, or attempting to deprive or defraud others "of a fair and impartially conducted election process." 52 U.S.C. § 20511(2).

Nor does the First Amendment require us to add another mental state for a statute that already has three of them. When courts have done so, it is typically when "none exists" on the face of the statute, creating what appears to be a strict-liability crime. *Elonis v. United States*, 575 U.S. 723, 734 (2015); *see United States v. Staples*, 511 U.S. 600, 605 (1994) (implying a mens rea because the statute was "silent" on whether it had one). But a statute with three does not impose strict liability, and we can presume that Congress would have added others if it thought they were necessary. *See United States v. Feola*, 420 U.S. 671, 684 (1975) (refusing to add a requirement that "an assailant be aware that his victim is a federal officer"); *United States v. Hutzell*, 217 F.3d 966, 968 (8th Cir. 2000) (declining to add an element that would have required the defendant to know it was illegal for him to possess a gun).

Even if the statute did not list any, the First Amendment still would not require us to add one here. Fraud itself is historically unprotected, meaning the government can freely regulate it. *See Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 349 (1995) (emphasizing that a state's interest "in preventing fraud . . . carries special weight during election campaigns"). And here, Taylor's conduct ticks all the boxes: knowing misrepresentation of a material fact, reliance, gaining a material advantage (for her husband), and intent to deceive. *See United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion); *United States v. Hawley*, 619 F.3d 886, 896 (8th Cir. 2010) (listing the elements of fraud under Iowa law). There is no chance that

criminalizing her conduct raises a First Amendment problem, either on its own or because it "chill[s] protected speech." *Madigan*, 538 U.S. at 619; *cf. United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (suggesting "that a statute completely bereft of a scienter requirement" could raise serious constitutional concerns under the First Amendment).

B.

Taylor's argument on the remaining counts is similar, except it hinges on the interaction between the words "false information" and "knowingly or willfully" in 52 U.S.C. § 10307(c). Together, she thinks they impose two requirements. First, knowledge that it was illegal for the parents to fill out the documents, with or without the consent of their children. And second, like the other charges, that she knew her conduct violated Iowa law.

The first of these two requirements is both extra-textual and in tension with what we have already said about the statute: "forg[ing] a voter's signature" is itself a form of "false information." *United States v. Boards*, 10 F.3d 587, 590 (8th Cir. 1993) (discussing 42 U.S.C. § 1973i(c), later moved to 52 U.S.C. § 10307). This conclusion is consistent with the instruction the district court gave here, which is that "[s]igning another person's name on voting documents without permission from the people whose names they signed may constitute giving false information." Right before, the instruction made clear that Taylor had to have "acted knowingly or willfully." The combination included everything the government needed to prove, which is that Taylor knew the signatures were forged and submitted the documents anyway. *See id.*; *United States v. Smith*, 231 F.3d 800, 814 (11th Cir. 2000) ("[N]othing in [the statute] require[d] that the information be given without . . . permission.").

As for the now-familiar argument that the jury had to find that she knew her conduct was illegal, a mistake of law is no defense to a false-information prosecution. Recall that either of two mental states will suffice: "knowingly *or*

willfully giv[ing] false information." 52 U.S.C. § 10307(c) (emphasis added). Phrased in the disjunctive, the statute and instructions let the jury find her guilty if the government proved beyond a reasonable doubt that she "knowingly . . . [gave] false information," which under *Boards* includes a forged signature, regardless of whether she knew her conduct was a crime. *Id.* There was no error in instructing the jury along those lines.

But even if there had been, it would not have made a difference. The instructions on the other counts required her to know the documents "were materially false, fictitious[,] or fraudulent" and that she intentionally misled election officials into accepting them despite knowing they were "defective under Iowa law." If a properly instructed jury found her guilty of those counts, it necessarily follows it would have found her guilty of these counts, even if she had to know she was committing a crime. *See Redding v. Benson*, 739 F.2d 1360, 1363–64 (8th Cir. 1984). Any error, in other words, was harmless beyond a reasonable doubt. *See United States v. Triana*, 79 F.4th 896, 902–03 (8th Cir. 2023).

### III.

The offense elements also play a role in deciding the next issue, which is whether the evidence was sufficient to convict Taylor. Our review is de novo, but we must view the evidence "in the light most favorable to the verdict and draw all inferences in favor of the government." *United States v. Richardson*, 92 F.4th 728, 730–31 (8th Cir. 2024) (citation omitted).

### A.

The mental-state requirements yet again take center stage. The focus now, however, is on whether the evidence showed that Taylor knew her actions were illegal and went ahead with them anyway. As in many cases, there is little direct evidence about what she was thinking, but "the jury [was] entitled to scrutinize and make reasonable inferences from [her] conduct and from all [the] facts surrounding

the incident[s]." *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006) (citation omitted).

Start with the voter-fraud counts. To convict her, the government had to prove that Taylor "knowingly and willfully" acted and knew that the registration documents or ballots she "procure[d]" were "materially false, fictitious, or fraudulent under [Iowa] law[]." 52 U.S.C. § 20511(2)(A)–(B). As applicable here, she must have both (1) known that the documents were defective under Iowa law; and (2) intentionally "procure[d] or submi[tted]" them anyway. *See Robertson*, 709 F.3d at 745 (stating that acting knowingly and willfully requires a defendant to know that "her conduct was in some way unlawful").

The most compelling evidence of knowledge came from the documents themselves. The jury saw an example of a voter-registration document, which included an affidavit requiring the signer to "swear or affirm under penalty of perjury that" he or she is "the person named above." It was hard to miss the warning: "[i]f you sign this form and you know the information is not true, you may be convicted of perjury." The absentee ballot had similar language. It required an "affidavit [to] be signed for your ballot to count." The affidavit made the signatory "swear or affirm" that he or she is "a qualified, registered voter" and "understand[s] that making a false statement on th[e] affidavit is a crime." It would have been clear to any signer, but especially to someone like Taylor who was running a get-out-the-vote scheme, that turning in these forms with forged signatures violated Iowa law. *See* Iowa Code §§ 39.3(17), 39A.2(a)(1), (b)(2).

Taylor's efforts to conceal her actions suggested consciousness of guilt. After all, if she believed her scheme was legal, there would have been no reason to ask the families to keep it a secret from their voting-age children. A permissible inference the jury could—and likely did—draw is that she wanted to avoid coming to the attention of law enforcement. *See United States v. Mann*, 701 F.3d 274, 307 (8th Cir. 2012) (observing that "conduct is not innocent" when a defendant acts "with consciousness of wrongdoing in concealing" information (citation omitted)).

Testimony also established that she acted willfully when procuring and submitting the forged documents. When one family member "asked [Taylor]" if it was "okay" to "complet[e] [a] form . . . for [her] children," she responded, "yes, it's okay." Another said that Taylor brought registration forms to his house, including for his two sons, and then "ha[d] [him] sign" them. Others testified that they gave Taylor their children's blank voting forms, which she later completed, signatures and all. The bottom line is that the jury could "infer[]" that she knew the forms were false or fraudulent and that she intended to submit them that way. *Richardson*, 92 F.4th at 732; *see* 18 U.S.C. § 2(a); *United States v. Lemoine*, 104 F.4th 679, 684 (8th Cir. 2024) (observing that "a jury may convict based on circumstantial evidence"). And given the lengths she went to do it, there is no chance it happened through "ignorance, mistake, or accident."[3] *Holy Bull*, 613 F.3d at 874 (citation omitted) (describing the "knowingly" standard); *see id.* (observing that multiple occurrences of similar acts across different times indicate "purpose," not "ignorance, mistake, or accident").

B.

The evidence led back to Taylor, who visited each of the victims' homes personally. Her view, however, is that equivocal testimony from three families requires us to vacate a few of her convictions.

First is the Luu family, which had two voting-age children whose documents were forged. Their father testified that Taylor was the one who brought the forms, completed them, and had family members sign for the children who were out when

---

[3]It follows that the evidence sufficiently showed that she "knowingly *or* willfully [gave] false information." 52 U.S.C. § 10307(c) (emphasis added). As we have explained, "false information" includes a forged signature, which Taylor either placed on the documents herself or had someone else add. *See Boards*, 10 F.3d at 590. Her direct involvement allowed the jury to infer that she must have known the signatures were fake. And there is no question that Taylor provided the "false information . . . for the purpose of establishing" the children's "eligibility to register or vote," 52 U.S.C. § 10307(c), not for some other reason.

she visited. He could not remember other details, such as whether Taylor took the forms with her, but both children said that the signatures were not their own.

Even though a few details were missing, the jury could infer that Taylor was to blame. She had, after all, done the same thing with other families. The government may not have had ironclad evidence that she submitted the forms to the county auditor's office, but the jury was allowed to infer that she did based on her pattern of behavior. *See United States v. Ross*, 263 F.3d 844, 847 (8th Cir. 2001) (noting that the jury can rely on a "distinctive modus operandi" to connect a defendant to other crimes); *United States v. Baker*, 98 F.3d 330, 338 (8th Cir. 1996) ("The evidence need not exclude every reasonable hypothesis except guilt." (citation omitted)).

Yen Nguyen's family had a similar experience. Her grandfather recalled that a woman named "Phuong," who had a husband named "Taylor," came to his house and took the blank voting forms he had received in the mail. Sure enough, Yen's forms, which she testified were not in her handwriting, ended up with the county auditor without her knowledge. Just like the Luus, the jury could infer that Taylor was the one who made sure they ended up there, forged signature and all. *See Ross*, 263 F.3d at 847.

The same goes for Nguyen Huynh, whose circumstances present the closest call. His father remembered that someone had come by and taken voter-registration forms, but he could not remember who. He believed it was a Vietnamese woman with an American husband, whom his son thought was probably "Kim Phuong or something."[4]

---

[4]Taylor argues in her reply brief that we cannot consider the son's statement because it is inadmissible hearsay. "[T]he evidence [was] admitted" without objection, however, so we can consider it on the narrow issue of whether the evidence "was sufficient to support a conviction." *United States v. Kenyon*, 397 F.3d 1071, 1076 (8th Cir. 2005).

As equivocal as his account may have been, the jury could consider it along with evidence of Taylor's "distinctive modus operandi." *Id.* Although it is theoretically possible that another Vietnamese woman with an American husband was distributing, collecting, and forging voter-registration forms in Sioux City, it was unlikely enough that the jury was entitled to reject it and find her guilty. *See United States v. Delpit*, 94 F.3d 1134, 1148 (8th Cir. 1996) ("[I]t is possible to have doubts that are not reasonable."). Especially in the absence of evidence that anyone else did it.

IV.

We accordingly affirm the judgment of the district court.

_____