# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1427

_____

United States of America,                      *
                                               *
            Appellee,                          *
                                               *
     v.                                         *
                                               *
Robert H. Frank, also known as                 *
"Butch" Frank,                                 *
                                               *
            Appellant.                         *

_____

No. 03-1452

_____

United States of America,                      *
                                               *
            Appellee,                          *
                                               *
     v.                                         *
                                               *
Lorin A. Ahlers,                               *
                                               *
            Appellant.                         *

Appeals from the United States
District Court for the Northern
District of Iowa.

_____

Submitted:  October 22, 2003

Filed:  January 5, 2004

_____

Before LOKEN, Chief Judge, and HEANEY and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This is an appeal by Robert Frank and Lorin Ahlers from their convictions and sentences. Mr. Frank was convicted on forty-nine counts, including mail fraud, conspiracy to defraud the United States, making false statements, obstruction of justice, and money laundering, and he was acquitted on two counts. He challenges the district court's[1] rulings concerning the admission of evidence, the denial of his motions for judgment of acquittal and new trial, a jury instruction, the calculation of the base offense level for his sentence, the assessment of an obstruction-of-justice enhancement, and an upward adjustment imposed for his role in the offense. Mr. Ahlers was convicted on nine counts, including wire fraud, conspiracy to defraud the United States, obstruction of justice, and money laundering, and he was acquitted on one count. He challenges the district court's rulings concerning the admission of evidence, the denial of his pretrial motion to sever, the denial of his motions for judgment of acquittal and new trial, the calculation of the base offense level for his sentence, and the failure to grant his motion for a downward sentencing departure. We affirm the district court in all respects.

I.

Mr. Frank was convicted in federal court in 1988 for burning down the house of Iowa District Court Judge Thomas Nelson, who had entered an adverse ruling against him. The indictment in the instant case charged Messrs. Frank and Ahlers with devising and participating in a scheme to defraud the United States in relation to its efforts to collect a fine and restitution payments arising from that arson

_____

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas, sitting by designation.

conviction. The government's case against both defendants was premised largely upon the theory that they had agreed with others to hide Mr. Frank's assets from the government and to lie about the existence and ownership of those assets.

After the verdict was returned against them, both defendants filed motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and alternatively for a new trial pursuant to Federal Rule of Civil Procedure 33. They contend that the district court erred in denying these motions because there was insufficient evidence to convict them of any offense. They argue generally that they committed no crimes because all of the assets that the government contends were owned by Mr. Frank were actually owned by others, and thus there could not have been any false statements, fraud, obstruction, concealment, or money laundering regarding those assets.

In reviewing the denial of a motion for judgment of acquittal, we view the evidence in the light most favorable to the verdict, giving the government the benefit of any reasonable inferences to be drawn from the evidence. *United States v. Howard*, 235 F.3d 366, 373 (8th Cir. 2000). We "reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* In reviewing the denial of a motion for a new trial, we affirm a district court's ruling absent a "clear and manifest abuse of discretion." *United States v. Jiminez-Perez*, 238 F.3d 970, 974 (8th Cir. 2001). "A new trial should be granted only 'if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred.' " *Id.* (quoting *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987)).

Viewing the evidence presented to the jury in the light most favorable to the government, we hold that it cannot be said that a juror must have had a reasonable doubt as to any count of conviction, and we are unable to conclude that a miscarriage of justice may have occurred. Both defendants' motions for judgment of acquittal and new trial were thus properly denied.

Mr. Frank was convicted on twenty-two counts of mail fraud in violation of 18 U.S.C. § 1341. These convictions require proof that Mr. Frank voluntarily and intentionally devised or participated in a scheme to defraud the United States by concealing his assets, that he entered into the scheme with the intent to defraud, that he knew that it was reasonably foreseeable that the mails would be used, and that he used the mails in furtherance of the scheme. *See United States v. Bearden*, 265 F.3d 732, 736 (8th Cir. 2001).

In 1998, Mr. Frank was released from prison on parole from his arson conviction. One of the conditions of his parole required him to make payments on the fine and restitution order imposed on him following his conviction. To aid in monitoring his ability to pay, he was required to submit monthly financial reports to the sentencing court's probation office disclosing, *inter alia*, all employment that he engaged, income that he received, and vehicles that he owned during the relevant month. Seventeen of Mr. Frank's mail fraud counts charged him with executing a scheme to defraud the United States, inhibiting its efforts to collect on the financial judgment, by mailing the probation office monthly financial reports that did not accurately reflect his assets and income. While Mr. Frank reported virtually no assets or income on the financial reports, the government presented evidence that he in fact owned many motor vehicles and that he had significant income from work done for Sproule Construction and for KW Sales (a business that the government contends was created at the request of Mr. Frank to hide his income from the government). After reviewing the evidence, we conclude that it was sufficient to sustain Mr. Frank's conviction on each of these counts.

Three counts charged Mr. Frank with mail fraud based upon three letters to the United States Attorney's Office, each of which asserted that a man named Irvin Valentine did not have the money to pay a debt that he allegedly owed to Mr. Frank. Mr. Frank had earlier advised the government during a debtor's examination that he had lent money to Mr. Valentine, and the United States had thus initiated a

garnishment action against Mr. Valentine. Mr. Valentine testified at trial, however, that there was no such debt. There was evidence that Mr. Frank, prior to sending the letters, had bought cars using the money that he had falsely claimed to have lent to Mr. Valentine. The mail fraud counts were based on the government's contention that because of the letters sent by Mr. Frank, it pursued the wrong avenue of collection and was impeded in its ability to garnish his income. Mr. Frank concedes in his brief that "the testimony of Mr. Valentine that there was no such debt may preclude the granting of a judgment of acquittal," but he nevertheless asserts that "a new trial is justified." We disagree with Mr. Frank's apparent position that, while a reasonable jury could have found him guilty on these counts beyond a reasonable doubt, the evidence relating to the letters weighs heavily enough against the verdict that a miscarriage of justice may have occurred.

The final two mail fraud counts related to the use of the mail to transfer titles for a Dakota truck and a Cutlass automobile, both of which the government contends Mr. Frank purchased out of state. Mr. Frank, however, argues that "there was no fraud involved in the transactions involving these vehicles, so there can be no fraud involved in sending the titles through the mail."

The Cutlass was purchased under the name of Cross Creek Stables, a body shop for used cars operated by John Helm. Mr. Helm testified that Mr. Frank, who had been his friend for many years, had approached him and stated that "[h]e needed to use my license to buy a few cars" in order to "[m]ake a little money." Mr. Helm testified that, during this discussion, Mr. Frank explained that "he couldn't get a license" himself because "he owed money," and that he "[c]ouldn't have no assets" because the government "would probably take all of his assets." The government presented evidence that Mr. Frank had purchased the Cutlass at an auction in Wisconsin using the name of Cross Creek Stables, and that the vehicle title was mailed to Cross Creek Stables in Iowa. Mr. Helm testified that Mr. Frank then asked him to register the car in Iowa in his business's name in exchange for one hundred

dollars.  In light of this evidence, Mr. Frank's argument that the car "was purchased by Cross Creek Stables" and "was never in Mr. Frank's name" is beside the point. The transaction was fraudulent, according to the government's theory, precisely because the title to the Cutlass "was never in Mr. Frank's name" despite the fact that he was the real party in interest and that he was the one who purchased the car from the auction.

The government presented evidence that the Dakota truck was purchased by Mr. Frank in Illinois, at which time Mr. Frank falsely represented to the seller that he owned a "car dealership" named KW Sales and that the sale was a "dealer-to-dealer" transaction.  The government's evidence showed that the seller mailed the title to Mr. Frank in Iowa, pursuant to Mr. Frank's instructions, that Mr. Frank then transferred title to KW Sales, and that Mr. Frank later sold the car and received $3,000.  Mr. Frank argues simply that the "truck was purchased by KW Sales" and that "[t]he title was in the name of KW Sales."  Mr. Frank has failed, however, to discredit the government's evidence that he fraudulently acquired and transferred title to the truck by falsely using the "KW Sales" name.

Both defendants were convicted on five counts of wire fraud in violation of 18 U.S.C. § 1343.  The essential elements of wire fraud are a scheme to defraud, the use of interstate wires incident to the scheme, and an intent to cause harm.  *United States v. Frost*, 321 F.3d 738, 741 (8th Cir. 2003).  According to the government, part of the defendants' scheme to defraud the United States by concealing Mr. Frank's assets involved the sale of a Corvette belonging to Mr. Frank.  Mr. Ahlers sent five interstate e-mails that the government contends were in furtherance of this scheme. These e-mails contained factual misrepresentations and details about plans to conceal the source and identity of the proceeds from the sale of the Corvette.  After reviewing the content of these e-mails, we conclude that a reasonable jury viewing them could have determined that both defendants were guilty on the five counts of wire fraud beyond a reasonable doubt.

-6-

Both defendants were convicted of obstructing justice in violation of 18 U.S.C. § 1503. The count charged obstruction and aiding and abetting the obstruction of justice in relation to the "administration, supervision, and execution" of the financial obligations imposed on Mr. Frank. The government provided evidence of several examples of such conduct, including evidence that the defendants planned with others to give false information to the grand jury, that Mr. Frank had told an auto dealer to withhold information from investigators, that the defendants contacted another auto dealer who had had business dealings with Mr. Frank during the grand jury investigation, and that the defendants conducted transactions in names other than Mr. Frank's to avoid the enforcement of the prior judgment against Mr. Frank. This evidence was sufficient to support the conviction.

Mr. Frank was convicted on a second count of obstructing justice in violation of § 1503 for moving, concealing, and refusing to advise law enforcement agents of the location of a Chrysler LeBaron, for the purpose of obstructing justice and with the knowledge that a court order had been issued to seize the vehicle. Relatedly, Mr. Frank was convicted of removal of an asset to avoid seizure in violation of 18 U.S.C. § 2232(a) for moving the LeBaron before it was seized, with knowledge that there was a federal court order to seize the vehicle, for the purpose of inhibiting or impairing the government's lawful authority to seize the vehicle. The government presented evidence that he moved the vehicle to the basement of a cottage in Illinois after he had reason to know of a seizure order for the car, that he later moved the vehicle sixty miles away to the top of a bluff in Wisconsin, and that, when asked by agents about the car, he became agitated and responded that he could not provide any help. In light of this evidence, we affirm the jury's verdict with respect to these counts.

Both defendants were convicted of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The money-laundering statute required the government to prove

that each of the defendants conducted or attempted to conduct a financial transaction, knowing that the property involved in the transaction represented the proceeds of unlawful activity, and knowing the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity. *See* 18 U.S.C. § 1956(a)(1)(B)(i). The transaction at issue in the money-laundering convictions was the sale and transfer of title to a Corvette. The government presented evidence that Messrs. Frank and Ahlers received five $3,000 cashiers checks in exchange for the Corvette, which checks were separately cashed at different banks, and that Mr. Frank received the proceeds of the checks. The government contends that the funds involved represented the proceeds of mail fraud (because neither the Corvette nor the proceeds from its sale were reported on Mr. Frank's mailed monthly statements), wire fraud (relating to the use of e-mail to sell the Corvette), and obstruction of justice. The government's evidence tended to show that the transaction was negotiated and structured so as to conceal or disguise the proceeds of the sale. The conspiracy count was based on evidence that the two defendants agreed to engage in the offense of money laundering, with respect to the Corvette transaction and several other financial transactions involving the proceeds of fraud and obstruction. We conclude that sufficient evidence existed for the jury to convict both defendants on the money-laundering and conspiracy counts.

Finally, Mr. Frank was convicted on sixteen counts of making false statements, based upon the monthly reports that he submitted to the probation office that were also at issue in seventeen of his mail fraud counts, and both defendants were convicted of conspiracy to defraud the United States, based upon their acting in agreement with each other, and others, to conceal Mr. Frank's assets and income. Our examination of the record reveals no reason to conclude that a reasonable jury could not have returned guilty verdicts on these counts.

## II.

While he was in prison for the arson conviction, Mr. Frank wrote letters to his mother in which he directed that certain actions be taken with regard to assets that the government contends Mr. Frank owned and had concealed from the government at the time of his arson conviction and that Mr. Frank contends he had legally transferred to others before the arson conviction. Both defendants argue that the district court erred in allowing these letters into evidence. They contend that the letters were either irrelevant or that, to the extent that they had relevance, their probative value was substantially outweighed by the danger of unfair prejudice, *see* Fed. R. Evid. 403. The Government contends that the letters were relevant to the issue of whether Mr. Frank continued to own or have a financial interest in assets that he had denied belonged to him.

The letters clearly had some relevance to issues concerning concealment or intent to defraud and the existence of a longstanding plan to hide and refuse to disclose assets that Mr. Frank was obligated to report to the government. Furthermore, any unfair prejudice presented by the letters was minimized by their redaction, to the satisfaction of Messrs. Frank and Ahlers, to remove any reference to "arson or criminal case or parole or anything having to do with the prior criminal matter." We thus hold that the district court did not err in admitting Mr. Frank's letters.

## III.

Mr. Ahlers contends that the district court erred in allowing him and Mr. Frank to be tried together. Although Mr. Ahlers filed a pretrial motion for severance, he did not renew the motion at the close of the government's case or at the close of all of the evidence, and we thus review the denial of the motion for plain error. *See United States v. Mathison*, 157 F.3d 541, 546 (8th Cir. 1998), *cert. denied*, 525 U.S. 1165 (1999). To succeed on plain-error review of the denial of the motion to sever, Mr. Ahlers must show "an abuse of discretion by the trial court as well as 'prejudice

affecting his substantial rights and an extraordinary reason to reverse.'" *Id.* (quoting *United States v. Rogers*, 150 F.3d 851, 855-56 (8th Cir. 1998), *cert. denied*, 525 U.S. 1113 (1999)). We conclude, for the reasons that follow, that the evidence of prejudice and abuse of discretion adduced here by Mr. Ahlers has not met this heavy burden.

In counts 1-15, 17-22, 29-44, and 47-48 of the first indictment, and both counts of the second indictment, Mr. Frank was the only defendant. In counts 16, 23-28, 45, 46, and 49 of the first indictment, both defendants were charged. Thus, while Mr. Frank was indicted on more counts than Mr. Ahlers was, Mr. Ahlers was not charged with any counts that Mr. Frank was not also charged with. All fifty-one counts were tried together over the course of a six-day trial.

Rule 14 of the Federal Rules of Criminal Procedure allows a district court to grant a severance of defendants if it appears that a defendant or the government is prejudiced by a joinder. *See* Fed. R. Crim. P. 14(a). The United States Supreme Court has noted that the joinder and severance rules "are designed to promote economy and efficiency and to avoid a multiplicity of trials, so long as these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial." *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (internal quotations omitted).

We have noted that generally defendants "charged in a conspiracy should be tried together, particularly where proof of the charges against the defendants is based upon the same evidence and acts." *United States v. Boyd*, 610 F.2d 521, 525 (8th Cir. 1979), *cert. denied*, 444 U.S. 1089 (1980). A district court may depart from this general rule by granting a severance only "upon defendant's showing of real prejudice," which may be demonstrated by showing either that the defendants' defenses are irreconcilable or that the jury will be unable to compartmentalize the

evidence as it relates to the separate defendants. *United States v. Washington*, 318 F.3d 845, 858 (8th Cir. 2003), *cert. denied*, 124 S. Ct. 209 & 251 (2003).

Mr. Ahlers does not argue that his defense was irreconcilable with Mr. Frank's; he argues only that the jury could not compartmentalize the extensive evidence offered against Mr. Frank from the evidence offered against him. According to Mr. Ahlers, he was prejudiced at the "long and drawn out multiple count" trial by certain testimony relating to the counts involving Mr. Frank but not him. Mr. Ahlers argues that "in the jury's eyes, if Frank was guilty of all these offenses and had association with Ahlers, then Ahlers must also be guilty on things that were alleged that they did in concert."

Mr. Ahlers's reliance on *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996), *cert. denied*, 520 U.S. 1179 (1997), is misplaced. In *Baker*, where evidence not admissible against the defendant seeking severance, yet implicating him in the crime for which he was convicted, came in through the case against the co-defendant, we concluded that it was "the rare case in which severance should have been granted." *Id.* at 335. Here, in contrast, Mr. Ahlers concedes in his brief that the evidence at issue that was presented against Mr. Frank "had absolutely nothing to do with Mr. Ahlers." The risk of prejudice here is thus much more speculative than it was in *Baker*.

"In assessing the jury's ability to compartmentalize the evidence against joint defendants, we consider the complexity of the case, whether any of the defendants was acquitted, and the adequacy of the jury instructions and admonitions to the jury." *United States v. Ghant*, 339 F.3d 660, 666 (8th Cir. 2003). Though there were a large number of counts in this case, all of them were connected by the government's theory that Messrs. Frank and Ahlers were engaged in a plan of hiding and lying about assets, and the defendants' theory of defense was common to all counts. The district court clearly and extensively instructed the jury, both at the beginning and the end of

trial, to view the case of each co-defendant separately, and there is nothing to suggest that the jury did not do so.  In fact, neither of the defendants was convicted on all counts, and on one of the counts, Mr. Frank was convicted while Mr. Ahlers was acquitted, which is a good indication that the jury made efforts to compartmentalize the evidence against each defendant.  Mr. Ahlers has failed to show an abuse of discretion by the district court, prejudice affecting his substantial rights, and an extraordinary reason to reverse.

IV.

Mr. Frank was convicted of obstructing justice in relation to the government's attempt to seize a Chrysler LeBaron pursuant to a court order.  He contends that a jury instruction related to this count was erroneous because it did not require commission of an "overt act" to convict him on the charge of obstruction of justice, as he argues § 1503 requires.  A district court has "wide discretion" in formulating a jury instruction.  *United States v. Darden*, 70 F.3d 1507, 1541 (8th Cir. 1995), *cert. denied*, 517 U.S. 1149 & 518 U.S. 1026 (1996).  "If the instructions, taken as a whole, fairly and adequately submitted the issues to the jury, we will affirm."  *United States v. Lalley*, 257 F.3d 751, 755 (8th Cir. 2001).

The jury instruction that Mr. Frank challenged read as follows:

Count 2 of the second indictment charges defendant, Robert H. Frank, with the crime of obstruction of justice.  That crime has three essential elements, which are:

One, defendant Robert H. Frank moved, concealed and refused to advise federal law enforcement agents of the whereabouts of a vehicle which they were authorized by federal court order to seize;

Two, defendant knew that a court order had been issued for the seizure of the vehicle;

-12-

Three, by moving, concealing, and refusing to advise federal law enforcement of the whereabouts of the vehicle, defendant corruptly endeavored to obstruct the due administration of justice in connection with the efforts of the United States to seize the vehicle and to partially satisfy the judgment imposed in the case of *United States of America v. Robert Frank*, No. 87-1010.

"Endeavor" means any effort or any act or attempt to effectuate an arrangement or to try to do something, the natural and probable consequences of which is to influence, obstruct or impede the due administration of justice.

"Corruptly" means that a defendant acted with an improper or evil motive or with the purpose of obstructing the due administration of justice.

For you to find defendant Frank guilty of the charged offense, the government must prove each of the three essential elements beyond a reasonable doubt; otherwise you must find the defendant not guilty of the charged offense.

At trial, Mr. Frank objected to the third element of the instruction, while he now objects to the first element (though the language in the first element that he now challenges is substantially similar to the language in the third element that he objected to at trial). The government contends that Mr. Frank has waived his right to challenge the instruction's first element on appeal because, by failing to object to it at trial, he failed to satisfy the requirement of Federal Rule of Criminal Procedure 30(d) that an objecting party "inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Assuming for the sake of argument that Mr. Frank has not waived his right to object, he has failed to show that the district court erred in its instruction to the jury.

Mr. Frank argues that "[t]he issue here is whether 18 U.S.C. § 1503 requires some overt act to obstruct justice, not just a failure to do something." We see no need

to consider the issue that Mr. Frank poses because the instruction, viewed in its entirety, clearly requires the commission of an "overt act" as opposed to a mere "failure to do something." The instruction required the government to prove beyond a reasonable doubt that Mr. Frank "corruptly endeavored" to obstruct justice. As the definitional section of the instruction states, the government was thus required to prove that Mr. Frank "acted with an improper or evil motive" and engaged in "any effort or any act or attempt to effectuate an arrangement or to try to do something." The language that Mr. Frank now challenges ("refused to advise") was, moreover, specifically changed from "failed to advise" at Mr. Frank's request. A "refusal" is itself an "overt act" that the government was required to prove pursuant to the instruction as a part of its showing that Mr. Frank corruptly endeavored to obstruct justice. Furthermore, "moving" and "concealing," which are both required in addition to "refusing to advise," are themselves overt acts, neither of which can be accomplished by merely failing to do anything. Mr. Frank's argument that the jury instruction permits conviction for a mere "failure to do something" in the absence of an "overt act" is without merit.

## V.

The district court increased Mr. Frank's offense level pursuant to § 3C1.1 of the United States Sentencing Guidelines. This section requires a two-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. "Under this section, the defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." *Id.*, comment. (n.9). The commentary to the sentencing guideline provides "a non-exhaustive list of examples of the types of conduct" that will support an enhancement, which includes not only committing perjury but also suborning perjury, producing or attempting to produce a false record during an official investigation or judicial

-14-

proceeding, and other conduct prohibited by the obstruction-of-justice provisions of the United States Code. *See id.*, comment. (n.4) (b), (c), (i).

Mr. Frank contends that the court erred in imposing an enhancement for obstruction of justice because the court did not specifically find that he committed perjury and because the other grounds relied upon for the enhancement inhered in the allegations of fraud, money laundering, and false statements themselves. We review the imposition of the enhancement for clear error. *United States v. Orchard*, 332 F.3d 1133, 1138 (8th Cir. 2003). We extend "great deference" to the district court's decision to grant an enhancement for obstruction of justice. *United States v. Calderon-Avila*, 322 F.3d 505, 507 (8th Cir. 2003) (per curiam).

The United States Supreme Court, in interpreting the sentencing guidelines provision at issue here, has stated that "if an accused challenges a sentence increase based on perjured testimony, the trial court must make findings to support all the elements of a perjury violation in the specific case." *United States v. Dunnigan*, 507 U.S. 87, 96-97 (1993). The commentary to § 3C1.1, however, provides that committing perjury is but one example of a broad range of conduct that will trigger the enhancement. Here, the district court stated that the sentencing enhancement was "based upon something other than a finding of perjury," namely, a "combination" of the fact that "Mr. Frank told something other than the complete truth during his testimony" and the facts contained in paragraph 251 of Mr. Frank's presentence investigation report. Paragraph 251 provided the following reasons for granting the enhancement: Mr. Frank encouraged Kimberly Welch and Jackie Schoenauer to give false testimony to the grand jury and they did so; Mr. Frank told Dave Weber not to disclose any information concerning some vehicles that Mr. Frank had given to Mr. Weber to sell; Mr. Frank gave materially false trial testimony, which was rejected by the jury; Mr. Frank made false oral and written statements to the government concerning his assets several times during the investigation of the instant offenses; and Mr. Frank took steps to conceal assets that were the subject of the investigation.

-15-

Because the district court made the factual findings that Mr. Frank committed most of the obstructive conduct described in paragraph 251, it was required to apply the obstruction-of-justice enhancement, whether or not its finding that "Mr. Frank told something other than the complete truth" would independently support the enhancement. Any error that the district court may have made by basing the enhancement, in part, on Mr. Frank's failure to tell the complete truth during his testimony is thus harmless, as the court also made findings of fact that themselves would have required imposition of the enhancement.

Mr. Frank maintains that obstruction of justice inhered in the charges of fraud, money laundering, and false statements themselves and that granting an upward adjustment thus amounted to double counting. He contends that his situation is comparable to that of the defendant in *United States v. Werlinger*, 894 F.2d 1015, 1016 (8th Cir. 1990), who had been convicted on a single count of embezzlement. We held that Mr. Werlinger's attempt to conceal his embezzlement prior to an FBI investigation of the crime was part of the embezzlement itself and thus could not be used to establish "willful obstruction of justice" for purposes of enhancing his sentence under § 3C1.1. *Id.* at 1016-19. As explained below, however, Mr. Frank's situation is distinguishable from that of Mr. Werlinger because he was convicted on multiple counts that were grouped together for sentencing purposes.

Section 3D1.1 of the sentencing guidelines directs that when a defendant has been convicted on more than one count, groups of closely related counts should be formed by applying rules found in § 3D1.2. *See* U.S.S.G. § 3D1.1(a)(1). In Mr. Frank's case, all forty-nine of his counts of conviction were grouped together to form a single group pursuant to § 3D1.2(b) because, according to Mr. Frank's presentence investigation report, "each of the offenses of conviction involved the same victim (i.e., society) and the offenses are connected by a common criminal objective or constitute part of a common scheme or plan." Section 3D1.3(a) directs that in the case of counts grouped together pursuant to § 3D1.2(b), "the offense level

applicable to the Group is the offense level ... for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group." In Mr. Frank's case, the district court found that the sentencing guideline corresponding to the money-laundering and money-laundering conspiracy offenses, as charged in counts 46 and 49 of the first indictment, produced the highest offense level. Thus, under the multi-count grouping rules, Mr. Frank's convictions on the forty-seven counts other than the two money-laundering offenses were disregarded in calculating the adjusted offense level.

Among the forty-nine counts that Mr. Frank was convicted on were two counts of obstruction of justice. Application note 8 to § 3C1.1 of the sentencing guidelines provides the following procedure for such a situation: "If the defendant is convicted both of an obstruction offense ... and an underlying offense ..., the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 ... The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater." In accordance with this procedure, the 2-level obstruction adjustment was applied to the money-laundering convictions.

The obstruction adjustment "applies to any ... obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense where there is a separate count of conviction for such conduct." U.S.S.G. § 3C1.1, comment. (n.4). As we have stated, "a defendant's 'separate count of conviction for obstructive conduct [is] a sufficient foundation for the obstruction-of-justice enhancement.' " *United States v. Herr*, 202 F.3d 1014, 1017 (8th Cir. 2000) (quoting *United States v. Olunloyo*, 10 F.3d 578, 581 (8th Cir. 1993)) (alteration in original). The jury convicted Mr. Frank on the two obstruction-of-justice counts based on the evidence presented by the government that Mr. Frank obstructed justice in multiple ways, which were summarized in paragraph 251 of Mr. Frank's presentence investigation

report as noted above. Much of the obstructive conduct that the government provided evidence of at trial was conduct that did not provide the basis for Mr. Frank's two money-laundering convictions. The conduct underlying the obstruction-of-justice convictions overlapped with, but went well beyond, the conduct underlying the money-laundering convictions. The imposition of the obstruction adjustment is not an impermissible double counting because the district court expressly identified obstructive conduct unrelated to the conduct underlying the money-laundering convictions, and the adjustment would have been identical had the conduct on which it was premised not included any of the obstruction of justice inherent in the money laundering. The district court did not err in imposing the adjustment for obstruction of justice pursuant to the grouping rules set forth in the sentencing guidelines.

## VI.

The district court increased Mr. Frank's offense level pursuant to § 3B1.1(a) of the sentencing guidelines, which is applicable when a defendant is "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." "We review the district court's decision to assess a sentencing enhancement based upon a defendant's role in the offense for clear error, and the government has the burden to prove that such an increase is warranted." *United States v. Johnson*, 278 F.3d 749, 752 (8th Cir. 2002), *cert. denied*, 536 U.S. 949 (2002). Mr. Frank does not challenge the district court's finding that the criminal activity involved five or more participants or was otherwise extensive, but he contends that the district court erred by finding that he was an organizer or leader.

We have interpreted the terms "organizer" and "leader" rather broadly. *United States v. Miller*, 91 F.3d 1160, 1164 (8th Cir. 1996). Application note 4 of § 3B1.1 lists several matters that a court should consider in determining whether a defendant was an organizer or leader: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation

in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." The presentence investigation report had recommended the four-level enhancement because the evidence showed that "there were more than five individuals involved," that Mr. Frank "played a leadership role in directing the activities of others as part of his criminal conduct," and that he "received a greater share of the proceeds from his criminal activity," and the district court adopted these findings at the sentencing hearing.

Much of the evidence presented against Mr. Frank indicated that he played organizing or leadership roles in the offenses of which he was convicted. For example, Ms. Welch testified that Mr. Frank did all of the buying and selling of cars for KW Sales and told her which checks to write, deposit, and cash; several auto dealers testified that Mr. Frank had approached them in order to use their names and licenses illegally to buy and sell used cars; Ms. Welch and Mr. Valentine testified that Mr. Frank had recruited them to assist in fabricating a story concerning an alleged $3,000 owed by Mr. Valentine to Mr. Frank; and there was testimony that Mr. Frank had instructed others to give false testimony to the grand jury and authorities. The entire scheme of illegal conduct existed for the purpose of hiding Mr. Frank's assets and income so that he could avoid making payments to the government, and he was the motivating force behind the actions taken by others in pursuit of that scheme. The government presented ample evidence supporting the district court's imposition of the four-level increase for Mr. Frank's role in the offense, and we are thus unable to conclude that this adjustment constituted clear error.

## VII.

Mr. Ahlers argues that the district court abused its discretion in denying his motion for a downward departure in his sentence under § 5K2.0 of the sentencing guidelines based on assistance that he provided to the government in finding assets. "A decision to deny a downward departure is not reviewable, however, unless the

district judge mistakenly believed that he or she lacked the authority to make such a departure." *United States v. Sypolt*, 346 F.3d 838, 841 (8th Cir. 2003). In this case, immediately prior to denying the motion, the district judge stated, "I believe I do have the authority under the guidelines to give the relief you seek." We are thus unable to review this decision.

## VIII.

The district court calculated the offense levels of the two defendants by reference to the 2000 version of the Federal Sentencing Guidelines Manual, which was in effect at the time that the defendants committed their offenses. Both defendants contend that the district court erred in using the 2000 version of the sentencing guidelines rather than the 2002 version, which was in effect when they were sentenced. We review the district court's application of the sentencing guidelines *de novo*. *United States v. Comstock*, 154 F.3d 845, 847 (8th Cir. 1998). We review a district court's factual findings in support of a sentence for clear error and "reverse only if we are left with the definite and firm conviction that the district court erred." *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998), *cert. denied*, 524 U.S. 940 & 945 (1998).

Section 1B1.11 of the sentencing guidelines provides that the court is to use the guidelines manual in effect on the date that the defendant is sentenced, unless the court determines that this would violate the *ex post facto* clause of the United States Constitution, in which case it is to use the manual in effect on the date that the offense of conviction was committed. "Because an amendment to a Sentencing Guideline has the potential to increase a defendant's punishment for a crime committed prior to the amendment, 'the ex post facto clause is violated if a defendant is sentenced under the Guidelines in effect at the time of sentencing when those Guidelines produce a sentence harsher than one permitted under the Guidelines in effect at the time the crime is committed.' " *Comstock*, 154 F.3d at 848 (quoting *United States v. Bell*, 991 F.2d 1445, 1452 (8th Cir. 1993)). In order to evaluate this

objection, then, it is necessary to compare the defendants' potential sentences under the 2000 and 2002 versions of the sentencing guidelines to determine which version results in a harsher punishment.

It was undisputed at both of the defendants' sentencing hearings that their sentences would be controlled by the money-laundering guideline, which, out of all the guidelines for the various counts that were grouped together, was the one resulting in the highest offense level. The money-laundering guideline, § 2S1.1, was amended in 2001, and the parties dispute whether application of the amended guideline would have resulted in harsher sentences for the defendants than those they received upon application of the 2000 version of the guideline. The resolution of this issue is ultimately dependent upon the actual or intended loss associated with the money laundering, the amount of money laundered, and the applicability of certain sentence enhancements available under the 2002 guidelines but unavailable under the 2000 guidelines.

Under the 2000 guideline, the base offense level for money laundering, as relevant here, was automatically 20. *See* U.S.S.G. § 2S1.1(a)(2) (2000). Section 2S1.1(b)(2) of the 2000 sentencing guidelines provides a scale of offense-level increases to the base offense level depending upon the amount of money laundered. The district court determined that an increase of one level for Mr. Frank was warranted pursuant to § 2S1.1(b)(2)(B), adopting the finding in Mr. Frank's presentence investigation report that he laundered "at least $100,000," which included "funds associated with the sale of automobiles, equipment and collectibles and other valuables as well as earned income." The district court thus used an offense level of 21 to sentence Mr. Frank, and an offense level of 20 to sentence Mr. Ahlers (not including the increases for role in the offense and obstruction of justice).

Under the 2002 sentencing guidelines, if the defendant committed the underlying offense from which the laundered funds were derived and the offense

level for that offense can be determined, then the base offense level for money laundering is the offense level for the underlying offense. *See* U.S.S.G. § 2S1.1(a)(1) (2002). In this case, the primary underlying offenses were fraud offenses, and the guideline for these offenses is U.S.S.G. § 2B1.1. Pursuant to § 2B1.1(a), the base offense level is 6. This level is then increased based on a scale of offense-level increases found in § 2B1.1(b)(1) corresponding to the amount of loss. As we have realized in relation to this guideline, "[s]ometimes the computation of loss is complicated." *United States v. Wheeldon*, 313 F.3d 1070, 1071 (8th Cir. 2002). The loss figure to be used is the greater of actual loss or intended loss. U.S.S.G. § 2B1.1, comment. (n.2(A)) (2002). In determining this loss figure, "[t]he court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1, comment. (n.2(C)) (2002). Here, the district court determined at Mr. Frank's sentencing hearing that it could "reasonably and conservatively guess that the Defendant's relevant conduct for these instant offenses of conviction involved an intended loss of at least $200,000, but not more than $350,000." Based on this determination, the court found that an increase of 12 levels was warranted pursuant to § 2B1.1(b)(1)(G) of the 2002 guidelines.

We conclude that the district court's determination that the intended pecuniary harm to the government from the fraudulent acts was at least $200,000 was a reasonable estimate. The amount that Mr. Frank owed had grown to over $500,000 by the time of trial. While he had made some minimal payments, there was evidence that he intended to prevent government collection of at least a substantial portion of the money that he owed. The government presented evidence at sentencing that Mr. Frank had concealed assets from the government valued at over $200,000 (including vehicles, bank deposits, and other funds and property), in addition to concealing his ownership of a cottage in Illinois and a property that had been the site of his auto business with a combined value of more than $200,000. The government

also presented evidence that Mr. Frank had concealed, in addition to these assets, over $40,000 in cash from the government.  While we recognize that some portion of the total sales price of vehicles fraudulently transferred by Mr. Frank is attributable to the purchase price of those vehicles and the expenses of getting them ready to sell, and did not represent a direct "loss" to the government, we do not think that it was necessary for the district court to have determined this figure precisely, as the court's intended loss estimate is sufficiently conservative to account for such expenses.  In any event, as we have previously noted, in reviewing an "amount of loss" estimation in connection with the fraud sentencing guideline, the "loss need not be determined with precision," *United States v. Berndt*, 86 F.3d 803, 811 (8th Cir. 1996), and "we are not inclined to allow the defendants ... a credit for money spent perpetuating a fraud," *United States v. Whatley*, 133 F.3d at 606.

The government has also shown that, had the 2002 sentencing guidelines been used, three additional increases that were unavailable under the 2000 sentencing guidelines would have been appropriate.  First, § 2S1.1(b)(2)(B) mandates a 2-level increase "[i]f the defendant was convicted under 18 U.S.C. § 1956."  Both defendants here were convicted under this statute.  Second, § 2B1.1(b)(7)(C) mandates a 2-level increase if the offense involved "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines."  The conduct at issue here involved the violation of the judgment in the arson case and a seizure order.  Third, § 2B1.1(b)(8)(C) mandates a 2-level increase if the offense "involved sophisticated means."  "Sophisticated means" is defined in application note 6 to § 2B1.1 as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  *See* U.S.S.G. § 2B1.1 (n.6) (2002)  "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells ... ordinarily indicates sophisticated means."  *Id.*  The government presented a great deal of evidence that the defendants attempted to conceal Mr. Frank's assets and income by using other individuals and businesses to conduct business on his behalf, and that a shell entity named "KW

-23-

Sales" was created to provide cover for income that Mr. Frank earned and did not report to the government. We think that the district court would have credited this evidence and applied this enhancement had it employed the 2002 sentencing guidelines.

In accordance with these additions to the base offense level, under the 2002 sentencing guidelines the defendants would have had an offense level of 24 (excluding the adjustments for obstruction of justice and role in the offense), which is at least three levels higher than that which they received under the 2000 guidelines. We thus conclude that the district court properly used the sentencing guidelines in effect at the time the offenses of conviction were committed so as to avoid a violation of the *ex post facto* clause. We note that even assuming arguendo that the "actual or intended loss" associated with money laundering fell below the $200,000 lower bound determined by the district court, application of the 2000 sentencing guidelines would have still been appropriate so long as the loss was more than $120,000, which would have resulted in a base offense level of 22 under the 2002 guidelines. *See* U.S.S.G. § 2B1.1(b)(1)(F) (2002).

While Mr. Frank has provided us with arguments relating to the appropriate calculation of the loss value and the applicability of other enhancements available under the 2002 guidelines, Mr. Ahlers has provided in his brief only the following summary argument for applying the 2002 guidelines: "Under the 2000 guidelines for money laundering there is a higher base level than the money laundering under the 2002 guidelines. Thus, it appears that the 2002 guidelines would have produced a shorter sentence for Mr. Ahlers and should have been used." Mr. Ahlers has advanced no arguments relating to the "actual or intended loss" attributable to his conduct or the applicability of other enhancements available under the 2002 guidelines that lead us to believe that the district court resolved these issues incorrectly in calculating his sentence. We thus affirm the district court's decision to apply the 2000 sentencing guidelines manual to both defendants.

## IX.

For the reasons indicated, we therefore affirm the judgment of the district court in all respects.

_____